700 So.2d 191 (1997)
Tara M. FORD, Appellant,
v.
Jay Alan FORD, Appellee.
No. 95-4319.
District Court of Appeal of Florida, Fourth District.
September 3, 1997.
Rehearing, Rehearing and Certification Denied October 28, 1997.
*192 Elizabeth S. Baker of Law Offices of Bailey & Jones, P.A., and Cynthia L. Greene of Law Offices of Cynthia L. Greene, P.A., Miami, for appellant.
Dirk Lorenzen of Caruana, Langan, Lorenzen and Mendelsohn, P.A., Miami, for appellee.
Rehearing, Rehearing En Banc and Certification Denied October 28, 1997.
POLEN, Judge.
Tara Ford appeals a final judgment of dissolution that awarded primary residential custody of the parties' then twenty month old daughter, Kylee, to the former husband; denied the former wife's claim for bridge-the-gap alimony; vacated the former husband's temporary alimony arrearages; denied the former wife's claim for equitable distribution; denied both parties' claims for attorney's fees, suit money, and costs; and obligated the former wife to pay child support until the child reached the age of nineteen pursuant to section 743.07, Florida Statutes (1995). Following our consideration of the extensive record on appeal, the parties' briefs, and oral argument of October 29, 1996, this court issued an order on October 31, 1996, reversing the custody determination and returning primary residential custody of the minor child to Tara Ford, with our opinion to follow. By this opinion we explain the reasoning underlying our determination regarding custody, reverse the final judgment, and remand for reconsideration as to alimony, child support, and attorney's fees in light of our disposition.[1]

FACTS
The parties were married for just over three years before separating, and had a twenty month old daughter, Kylee. It was the husband's third marriage and the wife's first marriage. Together they owned Boca Raton Hand and Upper Extremity Rehabilitation, Inc. (Boca Raton Hand), where the husband treated patients as an occupational therapist and the wife worked as the office coordinator.
Domestic violence became a central issue in this case from its inception. The husband was granted supervised visitation with Kylee following a temporary relief hearing before the Honorable John D. Wessel. In pertinent part, the order of temporary relief provided:
The Court has taken extensive testimony and concludes the Wife has justifiable reason to fear the Husband, because of the Husband's history of harassment, physical harm and uncontrollable temper and anger, although there is no evidence to support the position that the Husband has *193 been, in any way, abusive to the minor child. The apprehensions of the Wife are sufficient, based upon her experience with him.
A second temporary order was entered on February 1, 1995, which provided for shared parental responsibility of Kylee and physical residence with the wife, and also required the husband to pay temporary child support and alimony.
The majority of testimony adduced during the six-day final dissolution hearing concerned the issue of custody of Kylee and focused on domestic violence, with the primary focus on two distinct domestic disputes occurring on May 7, 1994, and October 26, 1994, the latter of which immediately preceded the parties' final separation. Several witnesses provided testimony regarding this violence, including Kay Jones, a Custody Evaluator who completed a court-ordered custody/visitation evaluation. Ms. Jones' eleven-page report contained a summary of her observations, numerous discussions with the parties and witnesses, and her ultimate recommendations.
The report details the May domestic dispute, after which the husband entered the Family Violence Intervention Program at the Parent-Child Center. The May dispute occurred on Mother's Day. The couple invited the husband's family to their house for a barbecue, but it was cancelled when the husband called his grandmother's house at 10:00 a.m. The husband's family traveled to the couple's house, and when they arrived the husband ran out of the house screaming, and told his family they better get in the house before he tore off his wife's head. The husband took a walk with his sister-in-law and told her he hit his wife again.
Rita Clark, director of the Family Violence Intervention Program, testified the husband participated in the program for a time. During his intake, the husband listed violence and abuse as his major problem areas and indicated his spouse was the "victim" of his domestic violence. Ms. Clark explained the husband's childhood was typical of someone with a family violence background. He reported his mother was abusive toward him, and he was jailed at one point for violence against his parents. The husband stated he was married once before, and reported violence against his first wife. Clark testified regarding occasions when the husband engaged in "victim blaming," where the perpetrator of physical violence states they are the victim of violence. She stated the husband told her he was working on trying to change.
The husband's conversations with Ms. Jones demonstrate his inconsistent and incomplete explanation of past events and the parties' history together. The husband reported to Ms. Jones that he was married twice before, his first marriage lasting eleven days and his second marriage lasting one year, yet he could not remember the last names of either wife or where or when he was divorced. When asked to supply a copy of each divorce decree, he stated he could only find his first divorce decree. He told Ms. Jones his first wife was abusive. When entering the Family Violence Intervention Program, the husband reported he was married only once before, and perpetrated violence against his previous wife.
The October 26, 1994, incidence of violence involved the husband throwing the wife on the floor. The wife testified he began kicking her in the chest, ribs, and legs. The wife ran out of the house and called the police, eventually leaving the house because she feared for her safety, as well as that of her daughter. The husband stated he slapped the wife, but only after she kicked him. He explained how he "lowered [the wife] to the floor," not "like she was a ninety year old woman," but he "didn't slam her to the flooreither." Following the October 26th incident, the husband phoned Michelle Lampert and told her the wife left because he hit her.
A prior incidence of violence occurred when the wife was four to five months pregnant. The former wife explained the husband was upset because she chose to attend her last day of work as an Emergency Medical Technician. The husband threw her on the floor of her closet, shoving her in the stomach, and kicking her in the side. The husband recounted the incident as involving an argument, after which the wife threatened to abort the baby, and then began hitting *194 herself in the stomach with a fist. The husband testified he restrained the former wife from this self-abuse by holding her wrists, and lowered her to the ground, holding her there for a period of time.
The former husband's testimony regarding domestic violence is revealing. The former husband told Ms. Jones the former wife was abusive. He explained he entered counseling because he "wanted more behavior management for her" and volunteered to attend the Family Violence Intervention Program "because I sought it out as an abused husband." He told Ms. Jones he was the victim in their relationship.
When questioned during the final hearing regarding the discrepancy between his deposition testimony, in which he testified he did not strike the wife, and his hearing testimony in which he admitted slapping his wife only twice and pulling her hair "certainly more than twice," the husband explained he was "being very specific" during his deposition. He justified the discrepancy by stating he defined "strike" to mean "to blow or to strike with an object, like a champagne bottle hitting a ship." He explained that because he had not hit his wife with an object, he responded to deposition questions by stating he did not "strike" his wife.
When asked why a woman weighing just over 100 pounds would regularly hit and kick a man weighing 165 pounds as the former husband alleged, he testified he could only speculate the reason was because his wife could not control her anger.
The husband admitted to Ms. Jones that he took the couple's Ford Mustang from the former wife's grandmother's home late one night after they separated, and knew the Ford Explorer he left in its place was "probably" going to be repossessed. Indeed, the car was repossessed the day before a scheduled May 27, 1995, visit, leaving the wife unable to transport Kylee to the husband for visitation, as she was required to do. The wife telephoned the husband, who agreed to drive to the wife's home in Miami. He appeared at the wife's home with several people and a video camera, explaining he wanted "to prove the [wife] was withholding visits."
In completing her evaluation, Ms. Jones recommended the former wife should have primary residential custody of Kylee because the former wife was more emotionally stable and would provide a better home setting for Kylee because the former wife lived with her father and grandmother in Miami.

THE FINAL JUDGMENT OF DISSOLUTION OF MARRIAGE
In the Final Judgment of Dissolution, the trial court ordered the parents to share parental responsibility of Kylee, and awarded primary physical residence to the former husband. It found the mother manipulated visitation during the litigation to the detriment of the father, using Kylee as leverage, concluding the father would be most likely to allow frequent and continuing contact between Kylee and the non-residential parent. The court found the child more closely bonded to the Mother, explaining this bonding was partly a function of the length of time Kylee spent with the Mother. It found both parties equally capable of providing for Kylee. The court did not address the continuity of residence factor, and found the permanence of the existing or proposed custodial home was insignificant in that neither party had a significantly permanent family unit.
Importantly, the court found the parties' physical health equal, but as to the issue of the parties' mental health, found:
Neither parent is mentally ill. Both parents were in need, are in need and will be in need of therapy and both have shown a willingness to obtain therapy. Parenting for both parents will continue to be difficult until their therapy helps them deal with the hard feelings that they have for each other. This factor favors the Father more than the Mother.
Finally, the court found the factor regarding willingness and ability to facilitate and encourage a close continuing relationship between the child and the other parent favored the father over the mother.
The court found both parties capable of working full-time following the dissolution, and supporting themselves. It found both parties contributed equally to the relative *195 career building of the other. The court noted the husband's arrearages for child support and alimony totalled $4,978.75, and vacated the spousal support portion of the arrearage, awarding the wife a credit of $2,461.00 against her child support payments.
The court found the value of Boca Raton Hand was "non-existent" and "negative" considering an outstanding equity loan and the small value of the business equipment and inventory. It found the market value of the business was nominal because the income generating ability was based on the presence and personal services of Mr. Ford, and distributed "this liability" to the husband. The trial court denied the wife's claim for $28,000 of equity in the business, determining the parties lived off the earnings of the business while married and the couple received compensation for their labor in the business.
The court found neither party able to pay their own attorney's fees, stating "[b]oth parties are insolvent." It found each party responsible to bear their own attorney's fees and costs.
Finally, the trial court determined child support obligations based on a $60,000 income for the father and an imputed income of $12,000 for the mother, stating the mother's obligation to pay child support would continue until the child reached the age of 18, or pursuant to section 743.07, was still in high school and reasonably expected to graduate before the age of 19.

PRIMARY PHYSICAL RESIDENCE
We are cognizant that the trial court's determination of a child's primary physical residence, made after evaluation of the factors listed in section 61.13, is subject to an abuse of discretion standard of review. Sullivan v. Sullivan, 668 So.2d 329, 329-330 (Fla. 4th DCA 1996). Under this standard, a determination of primary residential custody will be upheld by the appellate court "unless the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court." Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980). Further, the trial court's factual determinations in custody proceedings should be accorded great weight due to the wide discretion reposed in the trial court where the future of young children is at stake. Kern v. Kern, 333 So.2d 17, 19 (Fla.1976). Although the abuse of discretion standard is one of the most difficult for an appellant to satisfy, we find an abuse of discretion was demonstrated in this case. We conclude the trial court's custody determination was arbitrary and unreasonable with respect to the weight accorded the testimony offered, and the court's findings.
Were this a mere "he said, she said" case we would hesitate to reverse the final judgment, ever-mindful issues of credibility are within the sole province of the trial court judge. However, our review of the record reveals the trial court made no determinations regarding the credibility of either party. Our conclusion does not turn on a question of credibility. Rather we address the trial court's failure to apply section 61.13 as intended by its authors. A failure to properly apply the law, coupled with arbitrary and unreasonable findings unsupported by competent substantial evidence, lead to our decision the award of primary physical residence of Kylee to the former husband is an abuse of discretion.
We expressly decline the former husband's invitation to accept without comment a final judgment devoid of all but the most minimal mention of what undoubtedly became the central focus of the testimony presented to the trial court: an established pattern of domestic violence perpetrated by the former husband against the former wife. To do as the former husband asks and accept the final judgment despite its deafening silence as to this essential aspect, would be to relinquish our responsibility as a reviewing court.

FINDINGS UNSUPPORTED BY COMPETENT SUBSTANTIAL EVIDENCE
We recognize a trial court may generally rule on a custody issue without the need to pen findings. Murphy v. Murphy, 621 So.2d 455, 456 (Fla. 4th DCA 1993). As we noted in Murphy, in many cases the interests of a minor child are served by the absence of *196 findings in a final judgment of dissolution regarding a history of domestic abuse. Having said that, we note the instant record is replete with testimony during this six-day trial regarding domestic violence and spousal abuse; however, the final judgment meets this abundance of evidence with the single statement:
The Court has considered everything that each side has accused the other side of as well as all the good things that each side has presented about themselves.
Under the compelling facts of this case, this statement, standing alone as it does, is insufficient, and bolsters our finding an abuse of discretion.
We are troubled not only by the absence of any meaningful analysis of the extensive evidence of domestic violence, but also by the apparent misapplication of record evidence to the statutory factors contained in section 61.13(3), Florida Statutes (1995). That statute provides:
61.13 Custody and support of children; visitation rights; power of court in making order.
* * * * * *
(3) For purposes of shared parental responsibility and primary residence, the best interests of the child shall include an evaluation of all factors affecting the welfare and interests of the child, including, but not limited to:
(a) The parent who is more likely to allow the child frequent and continuing contact with the nonresidential parent.
(b) The love, affection, and other emotional ties existing between the parents and the child.
(c) The capacity and disposition of the parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home.
(f) The moral fitness of the parents.
(g) The mental and physical health of the parents.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
(j) The willingness and ability of each parent to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) Any other fact considered by the court to be relevant.
Section 61.13(3), Fla. Stat. (1995).
As to factors (3)(a) and (j), the trial court's expressed concern regarding difficulties encountered in visitation reflects a problem commonly occurring in cases where evidence demonstrates a pattern of domestic violence.[2] The trouble occurs when a court attempts to harmonize the non-abusive parent's conduct with "friendly parent" provisions. Here, the trial court failed to offset what it perceived to be the mother's violation of Florida's friendly-parent provisions, with what was recognized in the temporary order as the mother's "justifiable reason to fear the Husband." This failure resulted in an unbalanced final judgment that found "the Mother has manipulated the visitation during this litigation to the detriment of the Father," and failed to recognize the probability that the mother's actions were justified.
While the former husband himself eventually admitted perpetrating violence against the former wife, the former husband's *197 allegations of the former wife's violence stood unsubstantiated. The husband's unsupported accusations do not rise to the level of competent, substantial evidence required to support a fact finder's determination. Evidence relied on to support an ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957). The husband's mere accusations fall short of this standard.
As to factor (g), the record is devoid of competent substantial evidence supporting the trial court's finding this factor favored the father over the mother. To the contrary, this record is replete with testimony demonstrating the long history of abuse perpetrated by the former husband against the former wife, violence he sought help in controlling. The trial court's finding to the contrary is unsupportable.
After having previously concluded the trial court abused its discretion, and its findings were unsupported by evidence, we reversed the award of primary physical residence, ordering primary residence of Kylee be returned to the former wife. We cannot emphasize enough the exceptional nature of the facts of this case. Several factors combined to convince this court to issue an order reversing the trial court's erroneous custody determination as we did, prior to a full opinion in this matter, and without remand to the trial court. We issued our October 31st order after considering, among other issues, the husband's admissions of abuse, the final judgment's failure to address that abuse, the young age of Kylee, and the novel circumstances of this case. We caution the family law bar against urging application of this opinion to facts less exceptional, simultaneously noting we can envision few scenarios that would merit similar treatment by this court.

BRIDGE-THE-GAP ALIMONY
We reverse the denial of the former wife's claim for alimony in light of the changes occasioned by our reversal on the custody issue, and remand for redetermination of this claim. In light of our ruling reversing the primary physical residence of the parties' minor child, the purpose of bridge-the-gap alimony to aid the recipient spouse in making the transition from a married to a single state would be served by an award of such alimony to the former wife. Corchado v. Corchado, 648 So.2d 1261 (Fla. 4th DCA 1995).

TERMINATION OF CHILD SUPPORT
Our reversal of the custody issue renders moot the issue of the propriety of the provision of the final judgment extending the termination of child support payments until the minor child reaches the age of nineteen or graduates from high school. Should such a provision be considered on remand, we note the subject provision accurately tracks the language of section 743.07(2), and is therefore appropriate. Goodwin v. Goodwin, 640 So.2d 173 (Fla. 1st DCA 1994); Booth v. Booth, 625 So.2d 114 (Fla. 2d DCA 1993).

VACATING THE HUSBAND'S ARREARAGES OF TEMPORARY ALIMONY
We also reverse that portion of the final judgment vacating the husband's arrearages of temporary alimony in the absence of any motion seeking to vacate those arrearages. Grant v. Grant, 603 So.2d 68 (Fla. 1st DCA 1992). The former wife's right to the temporary alimony payments vested, and could not be altered by the trial court absent compelling circumstances not present here. Smithwick v. Smithwick, 343 So.2d 945, 947 (Fla. 3d DCA 1977).

EQUITABLE DISTRIBUTION
We affirm the distribution of marital assets in all respects except one. The final judgment "triple counts" the parties' $22,000 business and personal loan from Equity Bank to justify: 1) the award of the parties' business to the former husband; 2) the retention by the former husband of a greater share of the parties' personal belongings; and 3) the former husband's depletion of the marital savings account. Error occurs when a trial court charges the value of an asset against a party more than once. Hicks v. Hicks, 580 So.2d 876, 877 (Fla. 2d DCA 1991). Therefore, the "triple counting" of *198 the Equity Bank debt is reversed for reconsideration.

ATTORNEY'S FEES, SUIT MONEY AND COSTS
Finally, in light of the final judgment's recognition of the former husband's superior income, the trial court should not have denied the former wife's request for fees and costs. See Donsky-Levine v. Levine, 658 So.2d 1023, 1025 (Fla. 4th DCA 1995) (reversing an award of sixty-five percent of the former wife's attorney's fees on the basis 100% of the fees should be granted if there is great disparity in post-division assets or income). We reverse the denial of fees and costs, directing the trial court to award fees and costs to the former wife on remand.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
PARIENTE, J., and TAYLOR, CAROLE Y., Associate Judge, concur.
NOTES
[1] The delay in issuing the instant opinion was due in part to the husband's filing of a petition in bankruptcy on November 22, 1996, within one month of issuance of our October 31, 1996, custody order. The bankruptcy court entered a Discharge of Debtor on February 28, 1997, a copy of which was filed by the former wife in this court in March.
[2] Fredrica Lehrman's article, Factoring Domestic Violence into Custody Cases, TRIAL, Feb. 1996, at 32, is commended as offering an excellent explanation of the interaction between "friendly-parent" provisions, such as those contained in sections 61.13(3)(a) and (j), and provisions addressing domestic violence, such as that contained in Section 61.13(2)(b)2., which requires a court to consider evidence of spousal or child abuse as evidence of detriment to the child when making a determination regarding shared parental responsibility. Section 61.13(2)(b)2., Fla. Stat. (1995). The trial court failed to address the abuse issue.